OMNIPHONE, INC., et al., Appellants,

v.

SOUTHWESTERN BELL TELEPHONE
COMPANY, et al., Appellees.

No. 3–87–207–CV.

Court of Appeals of Texas,
Austin.

Dec. 16, 1987.

Rehearing Denied Jan. 20, 1988.

Charmaine J. Rhodes, Law Offices of Jim Boyle, Austin, for Omniphone, Inc., Ultraphone, Inc., Spectrum Advertising, Inc., HLD, Inc., and Christian Fellowship Institute.

Leon J. Barish, Barish & Van Helden, Austin, for Audio Five, Inc. and GGP, Inc.

Mike Aranson, Aranson & Shor, Dallas, for Netcom and Teleinfonet.

Robert J. Hearon, Jr., Graves, Dougherty, Hearon & Moody, Austin, for Southwestern Bell Telephone Co.

Jim Mattox, Atty. Gen., Stephen J. Davis, Asst. Atty. Gen., Austin, for The Public Utility Com'n of Texas.

Before SHANNON, C.J., and GAMMAGE and CARROLL, JJ.

1. Omniphone, Inc.
   Ultraphone, Inc.
   Christian Fellowship Institute
   HLD, Inc.
   Spectrum Advertising, Inc.
   Audio Five, Inc.
   GGP, Inc.

2. After appellants perfected an appeal from the order denying interlocutory relief, appellants filed original proceedings in this Court, pursuant to Tex.Gov't Code § 22.221(a). By their

SHANNON, Chief Justice.

Before the Public Utility Commission entered a final order in its proceeding in which a Southwestern Bell Telephone tariff is challenged, appellants [1] filed a declaratory judgment suit in Travis County. By their suit, appellants sought a declaration concerning the validity of the tariff. Ancillary to their declaratory judgment suit, appellants sought a temporary injunction. After hearing, the district court rendered judgment denying appellants' application for a temporary injunction. This Court will affirm that judgment.[2]

Appellants are subscribers to a service offered by Southwestern Bell Telephone, known as "Dial 976." By this service, the telephone company provides telecommunications, billing, and collections services for "information providers" (or "sponsors") such as appellants. The "clients" or customers dial a number beginning with "976" in order to gain access to messages provided by the sponsors by way of the telephone company's lines. The telephone company bills the clients, collects the charges, subtracts a fee for its handling services, and remits the remainder of the charges to the sponsors.

The telephone company filed, and the Public Utility Commission approved, tariff provisions which set forth the type of activities which are permissible under the "Dial 976" service. The pertinent section of the telephone company's General Exchange Tariff (§ 2.2.14) provides as follows:

" 'Dial 976' ... is intended only for the purpose of delivering recorded messages. It is not provided for receiving messages from clients nor for transmission of live (non-recorded) messages nor for data transmission."

original proceedings, Nos. 3–87–200–CV and 3–87–201–CV, appellants sought orders from this Court protecting its jurisdiction by preserving the subject matter of the appeal pending a hearing by this Court. This Court granted the requested relief and entered orders enjoining Southwestern Bell Telephone Co. from proceeding with the disconnection of the "Dial 976" telephone service. In light of the disposition of this appeal, this Court will dissolve the injunctive orders.

The Commission received information that appellants were not abiding by the terms of § 2.2.14 in that they were engaging in the transmission of "live" (non-recorded) messages. The telephone company also became aware of possible violations and, after beginning an investigation, the telephone company received a telephone call on January 2, 1987, from an attorney in the general counsel's office of the Commission. The attorney informed the telephone company that the Commission had received complaints that live messages were being received and transmitted on the "Dial 976" service. The Commission attorney told the telephone company employees to disconnect appellants' "Dial 976" service "as soon as possible." On or about January 5, 1987, the telephone company gave notice to the appellants that it intended to disconnect their "Dial 976" service.

After receiving the disconnection notices, the appellants filed complaints with the Commission challenging § 2.2.14 and seeking, primarily, an order prohibiting disconnection of the "Dial 976" service. The Commission denied appellants' request for an order prohibiting disconnection of the "Dial 976" service. Appellant's challenge of § 2.2.14 presently pends before the agency.

By the declaratory judgment suit, filed presumably pursuant to Tex.Rev.Civ.Stat. Ann. art. 6252–13a, § 12, appellants seek a declaration that § 2.2.14 is unconstitutional as a violation of the First Amendment of the Constitution of the United States and, further, that it is in violation of Tex.Rev. Civ.Stat.Ann. art. 1446c, §§ 38, 45 (Supp. 1987).

■ In an appeal from an order denying (or granting) an application for a temporary injunction, appellate review is confined to the validity of the order denying (or granting) the injunctive relief and the merits of the underlying lawsuit are not presented for review. *Davis v. Huey,* 571 S.W.2d 859 (Tex.1978). Indeed, appellate consideration of the merits of the underlying lawsuit in an appeal of a temporary order is error. *Id.; Hertz Corp. v. State Dept. of Highways,* 728 S.W.2d 917, 919

(Tex.App.1987, no writ). In a hearing on an application for a temporary injunction, the only question before the trial court is the appellant's right to the preservation of the *status quo* of the subject matter of the suit, pending a final trial on their merits. To warrant the issuance of a temporary injunction, the applicant need only show a probable right and a probable injury; he is not required to establish that he will finally prevail in the litigation. The trial court is clothed with broad discretion in determining whether the pleadings and evidence present a case of probable right and probable injury. The trial court's order in issuing or denying the writ of injunction will be reversed only on a showing of a clear abuse of discretion. *Transport Co. of Texas v. Robertson Transports, Inc.,* 261 S.W.2d 549 (Tex.1953). These rules are applicable in appellate review of a judgment rendered in a temporary injunction proceeding ancillary to a declaratory judgment suit. *Public Utility Commission v. City. of Austin,* 710 S.W.2d 658, 660 (Tex. App.1986, no writ).

■ For appellants to demonstrate a probable right to judgment based on a claim that their first amendment rights would be violated if the telephone company terminates their "Dial 976" service, they must first succeed in establishing that there is a likelihood that such act would constitute "state action." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). To establish state action, one must show that the state has, by its actions, exercised coercive power or "provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State" or that a private party has assumed a function which is traditionally "public" in nature. *Blum v. Yaretzky,* 457 U.S. 991, 1005, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982); *Jackson v. Metropolitan Edison Co.,* 419 U.S. at 353–355, 95 S.Ct. at 454–56.

■ The passive approval of a public utility's proposed tariff by a state agency does not constitute state action. *Jackson v. Metropolitan Edison Co., supra.*

Where the utility, itself, enforces the provision in the tariff, there is no state action. *Id.* at 355, 95 S.Ct. at 455–56 (utility's disconnection of electric service not state action). If, however, the state "puts its weight on the side" of the utility's action by ordering it, then such act becomes that of the state. *Id.* at 358, 95 S.Ct. at 457. The party contending that state action is present must show that "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 351, 95 S.Ct. at 453; *see Blum v. Yaretsky, supra.*

Appellants point to the telephone call made by the Commission's attorney to the telephone company as one basis for their claim that the disconnection of their "Dial 976" service would constitute state action and, in support of that contention, rely on *Carlin Communications v. Mountain St. Tel. & Tel.,* 827 F.2d 1291 (9th Cir.1987). In *Mountain States,* the telephone company disconnected Carlin's "Dial 976" service which supplied messages sexually explicit in nature. Before disconnection, a deputy county attorney wrote to Mountain States threatening to prosecute it under an Arizona law prohibiting the distribution of sexually explicit materials to minors unless Mountain States terminated Carlin's "Dial 976" service.

The court in *Mountain States* concluded that the prosecutor's letter represented an exercise of "coercive power" over Mountain States and, accordingly, that the subsequent disconnection of Carlin's "976" service constituted state action even though there was conflicting evidence whether the letter had actually been the motivating force behind Mountain State's action. Once the state has wielded its coercive power in this manner, the Court of Appeals reasoned, subsequent measures by the utility are deemed to be state action regardless of the actual impetus for the action. *Id.*

The opinion of the United States Court of Appeals for the 9th Circuit in *Mountain States, supra,* is, of course, not binding on this Court or the district court of Travis County. *Barstow v. State of Texas,* 742 S.W.2d 495 (Tex.App.—Austin 1987); *Woodard v. Texas Dept. of Human Resources,* 573 S.W.2d 596 (Tex.Civ. App. 1978, writ ref'd n.r.e.); Moore and Oglebay, *The Supreme Court, Stare Decisis and Law of the Case,* 21 Texas L.Rev. 514 (1943),[3] nor are we persuaded by its reasoning in the disposition of this appeal.

The proof in the present appeal is that, before the call from the Commission's attorney, the telephone company had already initiated and completed its investigation and concluded that appellants were in violation of the tariff. In fact, before the attorney's call, the telephone company had prepared termination notices to "Dial 976" companies in violation of the tariff and had forwarded those notices to its legal department for review prior to mailing. Finally, there was evidence, which the district court apparently believed, that the termination notices to the appellants were mailed upon the basis of the telephone company's investigation rather than from any prompting by the Commission's attorney.

Moreover, appellants marshalled no proof showing the authority *vel non* of the attorney to act for the Commission in assuming to order disconnection of the offending "Dial 976" companies. Only the Commission acting as a body can actually compel the telephone company to terminate appellants' service in enforcement of the tariff. *See City of Frisco v. Texas Water Comm'n.,* 579 S.W.2d 66, 72 (Tex.Civ.App. 1979, writ ref'd n.r.e.).

Under this record, this Court is not persuaded that the district court abused its discretion in failing to conclude that the Commission "exercised coercive power or

---

**3.** While a decision of a federal court, other than the Supreme Court, may be persuasive in a state court on a federal matter, it is, nevertheless, not binding, *since the state court owes obedience to only one federal court, namely, the Supreme* Court. The converse is also true: a decision of a state court on a federal matter may be persuasive in the federal courts but is not binding. Moore & Oglebay, *supra.*

... provided such significant encouragement" that the telephone company's actions "must in law be deemed to be that of the State." *Blum v. Yaretsky, supra.*

■ Appellants further claim that they have established state action because the Commission pressured the telephone company to include language in the pertinent section of the tariff to the effect that only recorded messages could be transmitted on its "Dial 976" service. *See Carlin Communications v. Southern Bell,* 802 F.2d 1352 (11th Cir.1986). The proof, however, is conflicting with regard to whether the Commission exerted such pressure. In these circumstances, it is within the discretion of the trial court to deny interlocutory relief. *Davis v. Huey, supra.*

Appellants also attempt to predicate their state action claim upon evidence that the telephone company assumed the public function of protecting minors from obscene speech. The evidence is conflicting whether the telephone company requested the tariff provision because it desired to protect minors from such speech. The district court could have concluded that the telephone company had no such objective and rather adopted such a policy to protect its "corporate image." Under this state of the record, the district court did not err in denying interlocutory relief. *Davis v. Huey, supra.*

In this limited appeal, this Court cannot fairly conclude that the district court abused its discretion in failing to determine that the telephone company's termination of the "Dial 976" service constituted state action. Having so decided, this Court need not proceed to investigate appellants' claim that § 2.2.14 of the tariff violated appellant's First Amendment right to freedom of speech.

By their suit, appellants also sought a declaration that the telephone company unreasonably discriminated against them by prohibiting live communication on its "Dial 976" service but allowing such communications on AT & T's "700" and "900" services. In addition to the billing and collections services which the telephone company provides under its own "Dial 976" service,

the telephone company provides such services for AT & T's "700" and "900" services. Contrary to its position regarding its own "Dial 976" service, the telephone company does not prohibit AT & T from allowing certain types of live communications on the latter's "700" and "900" services. Appellants contend that this difference in treatment constitutes unlawful discrimination. Appellants' claim is grounded on § 45 of the Public Utility Regulatory Act (PURA), Tex.Rev.Civ.Stat.Ann. art. 1446c, § 45 (Supp.1987). Section 45 provides

> No public utility may, as to rates or services, make or grant any *unreasonable* preference or advantage to any corporation or person within any classification, or subject any corporation or person within any classification to any *unreasonable* prejudice or disadvantage. *Id.*

(Emphasis supplied).

■ The statute does not prohibit discrimination *per se* but only unreasonable discrimination. In determining whether unlawful discrimination exists, the Court must determine whether the alleged discrimination falls within "a permissible range of unequal treatment which, while literally discriminatory, is not unlawfully so." *Amtel Communications, Inc. v. Public Utility Commission,* 687 S.W.2d 95, 102 (Tex.App.1985, no writ). Even given certain dissimilarities between services or customers, a party must show why the dissimilarity presents a substantial and reasonable ground for treating the parties differently. *AT & T Communications v. Pub. Util. Com'n,* 735 S.W.2d 866, 871 (Tex.App.1987, writ pending).

■ One major difference between the "Dial 976" service and AT & T's "700" and "900" services is that the "Dial 976" service is offered by the telephone company whereas the other two services are not. The telephone company only sells AT & T access to its lines and provides billing and collection functions for these services. The telephone company (or the Commission) does not have the ability to regulate the format of the AT & T services.

Even where parties are not similarly situated, the utility must show "why the dissimilarity represents a substantial and reasonable ground for treating the parties differently." *AT & T Communications v. Pub. Util. Com'n, supra* at 871. The telephone company emphasizes the importance of maintaining its "corporate image." The types of activities allowed on its own "Dial 976" service would tend to have a stronger effect on the telephone company's "image" than activities which occur on AT & T's "700" and "900" services. The evidence was that the telephone company was highly conscious of the fact that charges for AT & T's services were billed on a separate sheet than those charges for its services. The telephone company makes clear which services it provides and which services AT & T provides. There appears to be a "substantial and reasonable ground" for allowing AT & T to have live communications on its "700" and "900" services while prohibiting such speech on the telephone company's "Dial 976" services. *AT & T Communications v. Pub. Util. Com'n, supra* at 871.

There are other basic dissimilarities between AT & T's services and the telephone company's "Dial 976" service. The access tariffs for AT & T's "700" and "900" services do not allow a participant (*e.g.* a "sponsor" such as one of the appellants) on a telephone call to make a charge for that participation which would be billed by the carrier. The two AT & T services do not allow for the adult conversations which the appellants desire to sponsor, because there is no billing and collections service available to parties such as the appellants under the "700" and "900" services. The telephone company only bills and collects for AT & T and not for someone who might want to make use of AT & T's services.

In addition, the AT & T "900" service is not interactive in nature; callers to the service can only listen. The "700" service is a "teleconferencing" service in which users provide specific telephone numbers to which connection is desired for conference discussion. It does not provide for random calling nor does it permit the party setting up the call to bill other callers for that service through AT & T or the telephone company.

These are fairly significant distinctions between the types of services offered by AT & T and the telephone company. These dissimilarities also provide a reasonable basis for discriminating in the types of activities allowed on the services. As noted above, the activities allowed on the "700" and "900" services do not reflect on the telephone company's "corporate image" to the extent of activities on the "Dial 976" service. Furthermore, AT & T's services are not amenable to the types of programs desired to be offered by appellants. Even to the extent that AT & T's services might reflect on the telephone company, there is little likelihood that the live programs which appellants desire to offer could be economically successful on the "700" and "900" services. Accordingly, the telephone company has little reason to attempt to prohibit live speech on these services.

In sum, because it appears to this Court that appellants did not demonstrate a probability of success on their statutory discrimination claim, the district court did not err in denying interlocutory relief. Appellants' point of error is overruled.

The judgment is affirmed; the orders in Nos. 3–87–200–CV and 3–87–201–CV will be dissolved when this Court loses jurisdiction of the appeal.

CARROLL, J., not participating.